IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:15-CV-00199-D

| | |
|---|---|
| **Lisa D. Garrett,** | |
| Plaintiff, | |
| v. | **Memorandum & Recommendation** |
| **Carolyn Colvin**, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Lisa D. Garrett instituted this action on September 14, 2015, to challenge the denial of her application for social security income. Garrett claims that Administrative Law Judge Sara Alston erred (1) in failing to find that her impairments met or medically equaled a Listing impairment; (2) in finding that she could perform a reduced range of light work; and (3) in failing to properly weigh the opinion evidence. Both Garrett and Defendant Carolyn Colvin, the Acting Commissioner of Social Security, have filed motions seeking a judgment on the pleadings in their favor. D.E. 21, 23.

After reviewing the parties' arguments, the court has determined that ALJ Alston reached the appropriate decision. There is substantial evidence to support ALJ Alston's determination that Garrett's impairments do not meet the criteria for Listings 12.04 or 12.06. Additionally, ALJ Alston's finding that Garrett is capable of performing light work with restrictions is supported by the record. Finally, ALJ Alston properly considered the opinion evidence. Therefore, the

undersigned magistrate judge recommends that the court deny Garrett's motion, grant Colvin's motion, and affirm the Commissioner's decision.[1]

## I.      Background

On December 8, 2011, Garrett filed an application for disability insurance benefits alleging a disability that began on May 30, 2010. After her claim was denied at the initial level and upon reconsideration, Garrett appeared before ALJ Alston for a hearing to determine whether she was entitled to benefits. ALJ Alston determined Garrett was not entitled to benefits because she was not disabled.  Tr. at 119–32.

ALJ Alston found that Garrett had the following severe impairments: depression; generalized anxiety disorder; personality disorder; drug abuse; osteoarthritis; polyarthralgias; and eczema/psoriasis/psoriatic arthritis/dyshidrosis. *Id*. at 121. ALJ Alston also found that these impairments, alone or in combination, did not meet or equal a Listing impairment. *Id.* at 123–24. ALJ Alston then determined that Garrett had the residual functional capacity ("RFC") to perform a light work with the following limitations: she can occasionally reach overhead, occasionally balance, and occasionally stoop; she is limited to performing simple, routine, repetitive tasks consistent with unskilled work; she can have occasional interaction with coworkers, supervisors, and the general public; she must work in a low stress environment (meaning there are no high quotas or high production demands); and she must work in a routine or static work environment. *Id*. at 125. ALJ Alston also concluded that Garrett was incapable of performing her past work but that considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she was capable of performing. *Id*. at 130–31.

---

[1]  The court has referred this matter to the undersigned for entry of a Memorandum and Recommendation.  28 U.S.C. § 636(b).

These include merchandise marker, mail clerk, and garment inspector. *Id.* at 131. Thus, ALJ Alston found that Garrett was not disabled. *Id.* at 132.

After unsuccessfully seeking review by the Appeals Council, Garrett commenced this action by filing a complaint pursuant to 42 U.S.C. § 405(g) on September 14, 2015. D.E. 5.

## II. Analysis

### A. Standard for Review of the Acting Commissioner's Final Decision

When a social security claimant appeals a final decision of the Commissioner, the district court's review is limited to the determination of whether, based on the entire administrative record, there is substantial evidence to support the Commissioner's findings. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). If the Commissioner's decision is supported by such evidence, it must be affirmed. *Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

### B. Standard for Evaluating Disability

In making a disability determination, the ALJ engages in a five-step evaluation process. 20 C.F.R. § 404.1520; *see Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005). The analysis requires the ALJ to consider the following enumerated factors sequentially. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. At step two, the claim is denied if the claimant does not have a severe impairment or combination of impairments significantly limiting him or her from performing basic work activities. At step three, the claimant's impairment is compared to those in the Listing of Impairments. *See* 20 C.F.R. Part 404, Subpart P, App. 1. If the impairment is listed in the Listing of Impairments or if it is

equivalent to a listed impairment, disability is conclusively presumed. However, if the claimant's impairment does not meet or equal a listed impairment, the ALJ assesses the claimant's RFC to determine, at step four, whether he can perform his past work despite his impairments. If the claimant cannot perform past relevant work, the analysis moves on to step five: establishing whether the claimant, based on his age, work experience, and RFC can perform other substantial gainful work. The burden of proof is on the claimant for the first four steps of this inquiry, but shifts to the Commissioner at the fifth step. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).

## C. Medical Background

Garrett has complained of upper back and shoulder pain for which she requested pain medication. Tr. at 489–91. In June 2010, examination revealed no weakness, minimal neck movement, and a failure to abduct her arm, although she appeared able to do so. *Id*. Later that month, Garrett reported that she receive narcotic pain medication from friends. *Id*. at 492–93. Providers diagnosed her with opiate addiction. *Id*.

Garrett was hospitalized the following month with complaints of chest pain and left side weakness. *Id*. at 590–601, 668, 676–77, 689. Diagnostic tests were unremarkable. *Id*. Providers assessed atypical chest pain, non-cardiac, and discharged Garrett in stable condition. *Id*.

In September 2010, although treatment records reflect normal extremities, Garrett's primary care physician referred her to a specialist for shoulder pain as she continued to report joint pain. *Id*. at 500–03. Rheumatoid testing was negative. *Id*. at 507–08, 691–703.

Throughout 2011, Garrett had normal examination findings and minimal complaints of joint pain and fatigue. *Id*. at 520–22, 532–52. Her fatigue was noted as suggestive of sedation. *Id*. at 532–36. Providers diagnosed polyarthralgias as well as eczema, the latter of which improved with treatment. *Id*. at 544–56.

Dr. James Owen conducted a consultative examination on February 3, 2012. *Id*. at 558–62. He found that Garrett had mildly diminished range of motion in her cervical spine, but also had full strength and negative straight leg raises. *Id*. Dr. Owen opined that she may have moderate difficulty lifting, carrying, and handling objects but also noted that she could hear, see, speak, and travel. *Id*.

Dr. Lillian Horne, a state agency physician, conducted an RFC assessment on May 7, 2012. *Id*. at 294–95. She opined that Garrett was capable of a full range of medium work. *Id*. Dr. Stephen Burge affirmed this assessment on August 21, 2012. *Id*. at 722.

On April 16, 2012, consultative examiner Dr. Benjamin Mozie evaluated Garrett. *Id*. at 705–07. In finding that she had mild to moderate functional limitations, Dr. Mozie noted normal extremities, non-tender back, negative straight leg raises, full muscle strength, and normal sensation and range of motion. *Id*. He also found that Garrett's history was reliable to an extent. *Id*.

Additional treatment notes for 2012 and 2013 indicate minimal treatment for pain issues, minimal complaints of fatigue, and essentially normal exam findings with a normal gait. *Id*. at 661, 669, 712–18. In June 2013, Garrett was hospitalized for left-sided weakness. *Id*. at 786–830. She had 4/5 strength on the left and 5/5 strength on the right. *Id.* Diagnostic testing was normal and providers assessed a possible complication from a migraine. *Id*.

Garrett continued treatment with Jacksonville Children's and Multispecialty Clinic ("JCMC") through 2013 with generally normal findings. *Id*. at 885–904. In March 2014, Garrett had a rheumatology consult for her complaints of joint pain and stiffness. *Id*. at 834–37. Examination revealed full range of motion, intact coordination, reflexes, and sensation, and no difficulty with ambulation. *Id*. Garrett was diagnosed with osteoarthritis and chronic psychogenic

5

pain, and was referred to pain management. *Id*. Both a brain MRI and an EEG were normal. *Id*. at 839–40.

On June 5, 2014, Garrett underwent examination of her left shoulder and was noted to have exhibited poor effort in the exam. *Id*. at 89–97. Garrett returned to JCMC in July 2014 for hand and foot numbness, falling, and memory difficulty. *Id*. at 66–70. Examination revealed normal findings. *Id*. Thereafter, a September 2014 EMG/nerve conduction study noted generally normal results. *Id*. at 48, 51–56. A follow-up visit noted antalgic gait, limited lumbar range of motion, and a tender left shoulder. *Id*. at 42–50. A cervical spine MRI showed a disc bulge at C5-6 and disc extrusion at C6-7 effecting the nerve root. *Id*. at 48.

Providers at Carolina Spine evaluated Garrett in January 2015 for her knee and back pain. *Id*. at 30–34. Treatment notes reflect normal gait, improving neck pain, normal left knee, and full strength and range of motion. *Id*. Diagnostic testing showed mild medial compartment narrowing and diffuse degenerative changes. *Id*. at 34. Garrett returned to JCMC in February 2015 for moderate joint swelling but exam findings were normal. *Id*. at 8–12.

Garrett has also received mental health treatment. Throughout 2010, providers noted occasional anxiety and sadness but also normal mental status examinations. *Id*. at 471–84. On occasion, providers adjusted her medications. *Id*. Garrett sought no mental health treatment in 2011. In January 2012, consultative examiner Dr. Craig Farmer performed a psychiatric evaluation. *Id*. at 553–57. He noted a blunted affect and that Garrett appeared overly sedated. *Id*. Dr. Farmer diagnosed generalized anxiety and mood disorder with a possible history of psychosis, although she showed no evidence of psychosis during the exam. *Id*. Dr. Farmer assigned a Global Assessment of Functioning ("GAF") score of 55[2], indicative of moderate

---

[2] The GAF scale measures a person's overall psychological, social, and occupational functioning. Am. Psych. Assn., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev.

symptoms. *Id*. He also opined that she had limitations in her ability to retain and follow instructions and to sustain attention to perform simple tasks. *Id*.

Dr. Michelle King performed a second consultative examination on March 30, 2012. *Id*. at 563–68. Treatment notes from Garrett's examination reflect good concentration and attention. *Id*. She remarked that Garrett appeared to give inadequate effort with examination and that it was evident that she was exaggerating her cognitive problems. *Id*. Dr. King opined that Garrett was capable of simple, routine, repetitive tasks. *Id*.

Garrett did not pursue further, formal mental health treatment until June 2012, at which time her mental status exam was unremarkable except for a sad mood. *Id*. at 709–11, 781. Garrett's compliance with treatment was questioned in the following months when she reported that she was out of her medication. *Id*. at 744–46.

Dr. Michael Hammonds completed both a Mental Residual Functional Capacity Assessment ("MRFC") and a Psychiatric Review Technique Form ("PRTF") in August 2012. *Id*. at 723–40. He opined that Garrett had mild limitations in activities of daily living and moderate limitations in maintaining concentration, persistence, or pace. *Id*. at 737. He found her statements partly credible and not fully consistent with the medical evidence. *Id*. at 727. He opined that she had moderate limitations in six specific areas of functioning and that she was capable of performing simple, routine, repetitive tasks. *Id*. at 723–25. Dr. Hammonds also opined that Dr. Farmer's findings appeared to be based on Garrett's subjective reports. *Id*. at 728.

Treatment records from November 2012 through July 2013 noted mild symptoms or unremarkable findings. *Id*. at 779, 782–85. In July 2013, providers noted that Garrett's response to treatment had not been effective due to her lack of full participation in treatment. *Id*. at 750.

2000) ("DSM–IV–TR"). A GAF score between 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

By November 2013, providers noted improved mood, a good response to medication, and better compliance with treatment. *Id*. at 832.

In March 2014, Garrett was seen for memory loss and was diagnosed with cognitive dysfunction. *Id*. at 866–73. The next month she reported that she had been without medication for two months. *Id*. at 848. She noted improvement with memory, mood, and sleep the following month after resuming her medication. *Id*. at 845–47.

Neuro Care saw Garrett on July 29, 2014 for her memory difficulties. *Id*. at 112–14. Treatment records note good reasoning and judgment and intact memory. *Id*. Providers opined that her medications may contribute to her forgetfulness and depression. *Id*. The following month, Garrett returned to JCMC for anxiety and requested adjustment in her medications. *Id*. at 61–65. Exam findings were generally normal. *Id*.

### D.    Listings 12.04 and 12.06

Garrett first argues that ALJ Alston erred by failing to conclude that her impairments satisfied the requirements of Listings 12.04 or 12.06. The Commissioner responds to this arguments stating that ALJ Alston properly concluded that Garrett failed to meet the criteria for either Listing. The court concludes that Garrett has not established that her conditions are sufficiently severe to qualify under Listings 12.04 or 12.06.

### 1.    Overview of Listing of Impairments

The Listing of Impairments details impairments that are "severe enough to prevent an individual from doing any gainful activity." 20 C.F.R. § 416.925(a). If a claimant's impairments meet all the criteria of a particular listing, *id.* § 416.925(c)(3), or are medically equivalent to a listing, *id.* § 416.926, the claimant is considered disabled, *id.* § 416.920(d). "The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity

than the statutory standard [for disability more generally]. The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990); *see also Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (stating that the listings are designed to weed out only those claimants "whose medical impairments are so severe that it is likely they would be disabled regardless of their vocational background").

The claimant has the burden of demonstrating that his or her impairments meet or medically equal a listed impairment. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981); *see also Hancock v. Astrue*, 667 F.3d 470, 476 (4th Cir. 2012). As a result, a claimant must present medical findings equal in severity to all the criteria for that listing: "[a]n impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530–31; *see also* 20 C.F.R. § 416.925(c)(3). A diagnosis of a particular condition, by itself, is insufficient to establish that a claimant satisfies a listing's criteria. 20 C.F.R. § 416.925(d); *see also Mecimore v. Astrue*, No. 5:10–CV–64, 2010 WL 7281096, at *5 (W.D.N.C. Dec. 10, 2010) ("Diagnosis of a particular condition or recognition of certain symptoms do not establish disability.").

An ALJ is not required to explicitly identify and discuss every possible listing that may apply to a particular claimant. Instead, the ALJ must provide a coherent basis for his step three determination, particularly where the "medical record includes a fair amount of evidence" that a claimant's impairment meets a disability listing. *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013). Where such evidence exists but is rejected without discussion, "insufficient legal analysis makes it impossible for a reviewing court to evaluate whether substantial evidence supports the ALJ's findings." *Id.* (citing *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986)). In reviewing

9

the ALJ's analysis, it is possible that even "[a] cursory explanation" at step three may prove "satisfactory so long as the decision as a whole demonstrates that the ALJ considered the relevant evidence of record and there is substantial evidence to support the conclusion." *Meador v. Colvin*, No. 7:13–CV–214, 2015 WL 1477894, at *3 (W.D. Va. Mar. 27, 2015) (citing *Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011)). Nevertheless, the ALJ's decision must include "a sufficient discussion of the evidence and explanation of its reasoning such that meaningful judicial review is possible." *Id.*

### 2. Listing 12.04

ALJ Alston evaluated Garrett's mental impairments under Listing 12.04, affective disorders, and concluded she did not meet the criteria of that Listing. Tr. at 123–24. However, Goble contends that her impairments satisfy the required level of severity for this Listing.[3]

---

[3] Specifically, the Listing provides as follows:

> Affective disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

> A.  Medically documented persistence, either continuous or intermittent, of one of the following:

>> 1.  Depressive syndrome characterized by at least four of the following: (a) Anhedonia or pervasive loss of interest in almost all activities; or (b) Appetite disturbance with change in weight; or (c) Sleep disturbance; or (d) Psychomotor agitation or retardation; or (e) Decreased energy; or (f) Feelings of guilt or worthlessness; or (g) Difficulty concentrating or thinking; or (h) Thoughts of suicide; or (i) Hallucinations, delusions, or paranoid thinking; or

>> 2.  Manic syndrome characterized by at least three of the following: (a) Hyperactivity; or (b) Pressure of speech; or (c) Flight of ideas; or (d) Inflated self-esteem; or (e) Decreased need for sleep; or (f)

If a claimant has impairments satisfying this criteria, he must also establish Paragraph B[4] criteria.

A claimant can also meet this Listing by establishing Paragraph C[5] criteria.

Here, Garrett argues that she suffers from a mood disorder and depression. She alleges these conditions have caused her weight changes due to appetite disturbance, crying spells, memory loss, mood swings, sleep disturbances, social withdrawal, and impaired concentration. She also alleges she experienced hallucinations and suicidal ideations. Assuming, without

---

                    Easy distractibility; or (g) Involvement in activities that have a high probability of painful consequences which are not recognized; or (h) Hallucinations, delusions or paranoid thinking; or

      3.      Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes).

20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.04.

[4] Paragraph B requires two of the following:

     1.      Marked restriction of activities of daily living; or
     2.      Marked difficulties in maintaining social functioning; or
     3.      Marked difficulties in maintaining concentration, persistence, or pace; or
     4.      Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.04B.

[5] Paragraph C requires "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

     1.      Repeated episodes of decompensation, each of extended duration; or
     2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
     3.      Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.04C.

deciding, that Garrett has put forth evidence demonstrating she meets four of the Listing 12.04(A)(1) subcategories, she must also demonstrate the Paragraph B criteria are also satisfied.[6]

In making her disability determination, ALJ Alston made specific findings with respect to the Paragraph B criteria. Tr. at 123–24. She found that Garrett had moderate limitations in activities of daily living, noting that she could drive, care for her own personal needs, prepare meals, and perform some household chores. *Id*. at 123. She also reported shopping, attending church, and gardening. *Id*.

In social functioning, ALJ Alston found that Garrett had moderate difficulties. *Id*. She remarked that Garrett spent a significant amount of time alone with her daughter. *Id*. However, no provider found that she was unable to relate or communicate with others and that there was no evidence that she could not interact with others. *Id*.

ALJ Alston also found that Garrett had moderate limitations in concentration, persistence, or pace. *Id*. at 123–24. Acknowledging that her physical and mental impairments would cause some difficulty in this functional area, ALJ Alston also noted that Garrett's mental status exam findings were essentially normal. *Id*. She further observed that Garrett's activities of daily living counseled against a finding of marked limitation in this functional area. *Id*. at 124.

Garrett contends ALJ Alston's Paragraph B finding is erroneous. She asserts that she can no longer drive, that she cannot care for her grandchildren, and that she can only perform minimal housework. She also maintains that she cannot work around other people because of her auditory hallucinations and severe social phobias, which often cause her to lock herself in a room. She further avers that she has difficulty with memory, which has caused her to lose her way home and forget events. Garrett notes that Dr. Farmer found that she was limited in her abilities to understand, retain, and follow directions, sustain attention to perform simple, routine,

---

[6] Garrett does not appear to contend that her impairments satisfy the Paragraph C criteria.

repetitive tasks, tolerate stress, and relate to others. Finally, Garrett points out that she has routinely received mental health treatment since 2010 and that she requires intensive outpatient therapy.

The Commissioner points out, however, that while she received mental health treatment, her allegations were inconsistent with treatment records. Records from 2010 reflect, for instance, some sadness and anxiety but also reflect normal mental status exam findings and periodic medication adjustments. Tr. at 127. Garrett sought no formal mental health treatment in 2011. While Dr. Farmer noted some memory difficulties, he also found no overt evidence of psychosis and remarked that she appeared sedated. *Id.* at 553-57. Dr. King noted good attention and concentration and no cognitive deficits. *Id.* at 563–68. She also opined that Garrett did not give an adequate effort in testing and that she exaggerated symptoms. *Id.* Garrett's therapy notes also reflect mild symptoms from November 2012 through January 2013 (*id.* at 783–85), improved mood in March 2013 (*id.* at 782), normal mental status exam with intact memory in July 2013 (*id.* at 79), and essentially normal mental status exam findings throughout 2014 (*id.* at 61–65, 112–14, 845–48, 866–73). Her reported activities of daily living included caring for her grandchild, caring for her own personal needs, shopping, attending church, socializing, gardening, preparing meals, and performing some household chores. As the Commissioner points out, such activities are not only inconsistent with the requirements of Listings 12.04 and 12.06, but are also inconsistent with claims of total disability. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (claimant's pattern of daily activities suggests not disabled).

Moreover, ALJ Alston noted that the state agency consultants, Drs. Skoll, Reback, and Hammonds, all found that Garrett had moderate limitations in activities of daily living. *Id.* at 123. Additionally, state agency physicians and psychiatrists also concluded that she had

moderate limitations in social functioning and moderate limitations in maintaining concentration, persistence, or pace. *Id*. at 123–24. This constitutes substantial evidence to support ALJ Alston's Paragraph B findings.

Garrett has failed to demonstrate that she meets the Paragraph B criteria, and she therefore cannot establish that her impairments qualify under Listing 12.04. Accordingly, her argument on this issue lacks merit.

### 3. Listing 12.06

Along with the Paragraph B or the Paragraph C criteria, Garrett asserts that she qualifies under Listing 12.06[7] because she has a history of anxiety, agitation, recurrent panic attacks, and obsessive ruminations which cause sleep disturbances. Assuming, *arguendo*, that she satisfied 12.06A, she is unable to satisfy all the criteria of this Listing. As with Listing 12.04, she is also

---

[7] Listing 12.06A, affective-related disorders, requires a claimant to demonstrate one of the following:

1.  Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms: (a) Motor tension; or (b) Autonomic hyperactivity; or (c) Apprehensive expectation; or (d) Vigilance and scanning; or

2.  A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3.  Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4.  Recurrent obsessions or compulsions which are a source of marked distress; or

5.  Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress[.]

20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.06A.

required to establish the Paragraph B criteria. Having concluded that such a showing has not been made, the court cannot conclude that ALJ Alston erred by declining to find that Garrett's impairments met or equaled Listing 12.06. Accordingly, her argument on this issue lacks merit.

### E. RFC

Garrett asserts that ALJ Alston's finding that she can perform a reduced range of light work is not supported by the record. The Commissioner contends, correctly, that substantial evidence supports ALJ Alston's RFC finding.

The RFC is a determination, based on all the relevant medical and non-medical evidence, of what a claimant can still do despite her impairments; the assessment of a claimant's RFC is the responsibility of the ALJ. *See* 20 C.F.R. §§ 404.1520, 404.1545, 404.1546; SSR 96-8p, 1996 WL 374184, at *2. If more than one impairment is present, the ALJ must consider all medically determinable impairments, including medically determinable impairments that are not "severe," when determining the claimant's RFC. *Id.* §§ 404.1545(a), 416.945(a). The ALJ must consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. *Id.* § 404.1523; *see Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("[I]n evaluating the effect[] of various impairments upon a disability benefit claimant, the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them.").

Social Security Ruling 96-8p explains how the Commissioner assesses RFC. *See* SSR 96-8p. "The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Mascio*, 780 F.3d at 636 (quotation omitted). "Only after that may [RFC] be expressed in terms of the exertional

levels of work [:] sedentary, light, medium, heavy, and very heavy." *Id*. (quoting SSR 96-8p). Ruling 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id*. (quoting SSR 96-8p).

In support of this argument, Garrett point to her statements that: she suffers from severe pain, fatigue, and psychological impairments that are unpredictable; she cannot be around others due to her anxiety and auditory hallucinations; she has impaired memory and daily panic attacks; and she has difficulty walking, lifting, and using her hands. Garrett contends that her allegations have support in: Dr. Farmer's assessment, which found that she had limitations in her ability to sustain attention to perform simple, repetitive tasks or to tolerate stress; Dr. Owen's finding that she was moderately to severely impaired in her ability to lift, carry, or handle objects; and Dr. King's conclusions that her condition impacts her ability to follow complex instructions or to carry out complex tasks.

The Commissioner maintains that ALJ Alston considered all the evidence, as shown by the detailed reasoning in her decision. Tr. at 125–30. ALJ Alston noted that Garrett's statements concerning the intensity, persistence, and limiting effects of her alleged symptoms were not entirely credible. *Id*. at 125. In support of this finding, ALJ Alston pointed out that Garrett's allegations were inconsistent with her activities of daily living and with the objective medical evidence, including essentially normal exam and diagnostic findings. *Id*. at 126–27. She also noted that Garrett's mental health treatment has been inconsistent, she has never been hospitalized, she reported improved mood with medications, and her mental status exam findings were generally normal. *Id*. at 127–29. Thus, Garrett's statements of disabling symptoms were not consistent with the evidence of record.

Moreover, it is well-settled that a claimant's subjective allegations alone are insufficient to establish disability. *Craig v. Chater*, 76 F.3d 585, 591 (4th Cir. 1996) ("[S]ubjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant.") (citing *Mickles v. Shalala*, 29 F.3d 918, 922 (4th Cir. 1994). *See* 20 C.F.R. § 404.1529(a) ("statements about your pain or other symptoms will not alone establish that you are disabled"). As discussed below, the medical opinion evidence Garrett cites does not support her statements of the limiting effects of her symptoms. State agency physicians opined that Garrett was capable of performing at least a reduced range of light work. Tr. at 129. This constitutes substantial evidence supporting ALJ Alston's RFC finding. *See Thomas v. Barnhart*, 278 F.3d 947 (9th Cir. 2002) (opinions of non-treating or non-examining physicians may serve as substantial evidence when the opinions are consistent with other evidence in the record); *Tanner v. Comm'r of Soc. Sec.*, 602 F. App'x 95, 101 (4th Cir. 2015) (noting that while the 'testimony of a non-examining physician can be relied upon when it is consistent with the record.") (quoting *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986))

Having failed to identify persuasive evidence establishing that she is incapable of the demands of the reduced range of light duty work determined by ALJ Alston, Garrett's argument on this issue should be rejected.

### F.     Medical Opinion Evidence

Garrett next contends ALJ Alston erred in her consideration of the medical opinion evidence and the third party statement provided by her daughter, Ashley Neels. Specifically, she asserts that the opinions of Drs. Farmer, Owen, and King and Neels's statement deserved more

weight. She also maintains that ALJ Alston failed to explain her reasoning in declining to adopt the medical opinions that were inconsistent with her RFC determination.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). When evaluating medical opinions, the ALJ should consider "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. An ALJ's determination as to the weight to be assigned to a medical opinion generally will not be disturbed absent some indication that the ALJ has dredged up "specious inconsistencies," *Scivally v. Sullivan*, 966 F.2d 1070, 1077 (7th Cir. 1992), or has failed to give a sufficient reason for the weight afforded a particular opinion, *see* 20 C.F.R. § 404.1527(d) (1998).

According to 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2), a treating source's opinion on issues of the nature and severity of the impairments will be given controlling weight when well supported by medically acceptable clinical and laboratory diagnostic techniques and when the opinion is consistent with the other substantial evidence in the record. Conversely, however, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see also Craig*, 76 F.3d at 590 (finding that "if a physician's opinion in not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight"). A medical expert's opinion as to whether one is disabled is not dispositive; opinions as to disability are reserved for the ALJ and for the ALJ alone. *See* 20 C.F.R. § 404.1527(e)(1) (1998). Generally, the more the medical source presents relevant evidence to support his opinion, and the better that he explains it, the more weight his opinion is

given. *See* id. § 404.1527(d)(3) (1998). Additionally, the more consistent the opinion is with the record as a whole, the more weight the ALJ will give to it. *See id*. § 404.1527(c)(4).

### (1)    Dr. Farmer

As noted above, Dr. Farmer opined that Garrett was limited in her abilities to understand, retain, and follow directions, sustain attention to perform simple tasks, relate to others, and tolerate stress. Tr. at 556. He also noted that she reported poor memory and concentration. *Id*. However, ALJ Alston determined that this finding was inconsistent with Garrett's activities of daily living, which included reading. *Id*. at 129, 555. Dr. Farmer also noted that Garrett appeared sedated. *Id*. at 556. This may have impacted her testing or his assessment. Finally, Dr. Farmer stated that Garrett would be unable to handle her own finances. *Id*. at 557. However, this finding is contradicted by Garrett's own statement that she handles her own finances. *Id*. at 392.

ALJ Alston gave some weight to Dr. Farmer's assessment. *Id*. at 129. She noted that Dr. Farmer's findings were vague and that there was no evidence Garrett suffered from a marked mental impairment. *Id.* It appears clear that ALJ Alston not only considered Dr. Farmer's opinion but weighed it against the other evidence of record and provided reasons she afforded it some weight. Although Garrett may disagree with the determinations made by ALJ Alston after weighing the relevant factors, the role of this court is not to re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Craig,* 76 F.3d at 589; *see also Shively*, 739 F.2d at 989. As such, the court cannot conclude that ALJ Alston erred in failing to give Dr. Farmer's opinion more weight.

### (2)    Dr. Owen

Dr. Owen opined that Garrett's impairments would cause her moderate to severe difficulty in lifting, handling, and carrying objects. Tr. at 561. ALJ Alston gave this opinion

some weight, noting that it was vague but that it was also consistent with an RFC for a reduced range of light work. Dr. Owen's examination noted that she had full strength, mildly diminished ranges of motion, and that her ankles, hips, and knees were the areas primarily affected by her conditions. *Id*. at 559. His examination did not note any problems with her hands or arms, aside from dermatological cracking. *Id*. at 559–61. It is difficult to determine, then, his basis to assess limitations regarding lifting, carrying, and handling objects are based. Consequently, the court cannot conclude that ALJ Alston erred by failing to incorporate this limitation into Garrett's RFC. Accordingly, her argument on this issue lacks merit.

### (3) Dr. King

Dr. King opined that Garrett's conditions impacted her abilities to tolerate stress, follow complex instructions, and carry out complex tasks. *Id*. at 568. However, Dr. King also found Garrett did not appear to give an adequate effort with testing and that her cognitive problems appeared exaggerated. *Id*. at 566–67. She concluded that Garrett could get along with others, could understand and retaining simple instructions, and could sustain attention to perform simple and routine tasks. *Id*. at 567–68. ALJ Alston gave Dr. King's opinion some weight. *Id*. at 129. She noted that it was vague but that it comported with a finding that Garrett could perform unskilled work. *Id*. Again, as with the opinions of Drs. Farmer and Owen, Garrett has not identified error in the consideration of this opinion but only disagreement in the weight afforded to it. This is not a basis for remand. Consequently, her argument lacks merit and should be rejected.

### (4) Neels's Third Party Statement

In addition to evidence from the acceptable medical sources, an ALJ may also consider evidence from non-medical sources, such as relatives. 20 C.F.R. § 404.1513(d)(4). "Descriptions

of friends and family members who were in a position to observe the claimant's symptoms and daily activities have been routinely accepted as competent evidence." *Morgan v. Barnhart*, 142 F. App'x 716, 731 (4th Cir. 2005). The mere fact that a family member is not a neutral party is an insufficient reason to reject her statements. *See Nance v. Astrue*, No. 7:10–CV–218–FL, 2011 WL 4899754, at *11 (E.D.N.C. Sept. 20, 2011), *adopted by*, 2011 WL 4888868.

Here, ALJ Alston gave some weight to a report by Garrett's daughter. Tr. at 130, 463. ALJ Alston remarked that the report of Garrett's activities of daily living was helpful in determining her abilities but that the objective medical evidence suggested she was not as limited as reported. *Id*. Explaining why it was not deserving of more weight, ALJ Alston complied with the the requirements of 20 C.F.R. § 404.1513(d)(4). Because Garrett's argument amounts to disagreement, not error, her claim on this issue should be rejected.

**III.    Conclusion**

For the forgoing reasons, the court recommends that the court deny Garrett's Motion for Judgment on the Pleadings (D.E. 21), grant Colvin's Motion for Judgment on the Pleadings (D.E. 23), and affirm the Commissioner's decision.

Furthermore, the court directs that the Clerk of Court serve a copy of this Memorandum and Recommendation on each of the parties or, if represented, their counsel.  Each party shall have until 14 days after service of the Memorandum and Recommendation on the party to file written objections to the Memorandum and Recommendation.  The presiding district judge must conduct his or her own review (that is, make a *de novo* determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. §

636(b)(l); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Owen v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

Dated: July 21, 2016

ROBERT T. NUMBERS, II
UNITED STATES MAGISTRATE JUDGE